**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 24-cr-103 (TJK)** |
| **v.** | : | |
| | : | |
| **CURTIS PULASKI,** | : | |
| | : | |
| **Defendant** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. Defendant Curtis Pulaski has pleaded guilty to two second degree misdemeanors, a violation of 40 U.S.C. § 5104(e)(2)(D) (disorderly or disruptive conduct on the grounds or in the buildings of the United States Capitol) (Count One) and a violation of 40 U.S.C. § 5104(e)(2)(G) (parading, demonstrating, or picketing in any Capitol building) (Count Two). For the reasons set forth herein, the government requests that this Court sentence Curtis Pulaski to 21 days' incarceration on Count One and 36 months' probation on Count Two. The government also requests that this Court impose 60 hours of community service, and, consistent with the plea agreement in this case, $500 in restitution.

**I.      Introduction**

Defendant Curtis Pulaski, a 30-year-old technician, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power

after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

Pulaski pleaded guilty to violations of 40 U.S.C. § 5104(e)(2)(D) and (G). The following circumstances support the government's recommendation: (1) Pulaski climbed through a broken window on the Lower West Terrace during a time of violence between rioters and police into a non-public conference room, ST-2M; (2) Pulaski subsequently attempted to pull another rioter wearing a gas mask into the same room, and then handed back that rioter's stick (*i.e* his weapon) when the rioter could not climb in; (3) Pulaski observed rioters attempt to break down the door to an office deeper in the building, ST-6M; (4) Pulaski nonetheless joined them inside and photographed documents on a desk as the rioters ransacked the office; and finally (5) Pulaski deleted the photographs and videos he took after January 6, 2021.

The Court must also consider that Pulaski's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed.  Here, the facts and circumstances of Pulaski's crime support a sentence of 21 days' incarceration, 36 months probation, 60 hours community service, and $500 in restitution.

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

## II.     Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol.  *See* ECF No. 17 (Statement of Offense or "SOO") ¶¶ 1–7.

*Defendant Pulaski's Role in the January 6, 2021 Attack on the Capitol*

Defendant Curtis Pulaski traveled from Grand Rapids, Michigan to Washington D.C. to attend the former President's "Stop the Steal" rally by the Ellipse on January 6, 2021.  *See* SOO ¶ 8.  Pulaski wore a dark jacket, a red knit cap with the word "Trump" on it, and a black-and-white face mask, as depicted in Image 1 below.  *Id*.



*Image 1: Pulaski (circled) inside the U.S. Capitol on January 6, 2021*

Pulaski entered the U.S. Capitol Building via the Lower West Terrace in the mid-afternoon of January 6, 2021.[2]  SOO ¶ 9.  Specifically, Pulaski climbed through the bottom of a broken window to a conference room, ST-2M, to the left of the Tunnel.  *See* Images 2, 3 below.  At that time, rioters on the Lower West Terrace were besieging MPD and U.S. Capitol Police officers in

---

[2] The Government does not know exactly what time Pulaski entered through the window, but estimates it was around 4:20 p.m.

the Tunnel, which was mere feet away from the window to ST-2M.  SOO ¶ 9.  Pulaski later told

the FBI that this was the second time he had entered the building.[3]



*Image 2: The Capitol on Inauguration Day, with the window leading to ST-2M circled yellow*
*immediately to the left of the "Tunnel" (center)*

---

[3] The Government does not know when or where Pulaski first entered.



*Image 3: Pulaski (circled) moments after he climbed through bottom of the broken window to ST-2M*

Once inside, Pulaski tried to help another rioter climb into ST-2M through the same broken window.  SOO ¶ 10.  Specifically, Pulaski and another rioter, Gina Bisignano, tried to pull a rioter wearing a gas mask through the bottom portion of the window, but that rioter could not fit due to his backpack.  *See* Image 4.  Pulaski then handed back one of the sticks that the rioter had given moments earlier to Bisignano.[4]  *See* Image 5.

---

[4] The Statement of Offense incorrectly states that Pulaski initially pulled the stick through. Undersigned counsel has recently determined that this statement is inaccurate—Bisignano, not Pulaski, initially pulled the rioter's sticks inside.  *Cf.* SOO ¶ 10.  The Government has noted this correction to the PSR and regrets the error.



*Images 4 and 5: Pulaski tried to help a rioter wearing a gas mask climb through the smashed-out window, but after the rioter could not fit, Pulaski handed him his stick*

While inside ST-2M, rioters were milling about and tipping over furniture.  Pulaski put on a black-and-white mask, and at some point, picked up and wore a "Trump" flag as a cape around his shoulders.  *See* Image 6.



*Image 6: Pulaski (circled yellow) picked up a Trump flag and wore it as a cape inside ST-2M*

Around this time, Pulaski heard other rioters saying that police had shot and killed someone.  Nonetheless, rioters tried to get deeper into the building.  Pulaski saw rioters opening a door in ST-2M leading deeper into the building,[5] and followed them into the hallway beyond until they encountered another closed door, which led to ST-6M.  Pulaski saw rioters moving a large table into the hallway, for apparent use as a battering ram, and heard rioters' calls to break the door down.  *See* Image 7.  Pulaski turned around and headed back into ST-2M.

---

[5] Rioters took this door off its hinges, but it is not clear Pulaski saw this when it happened.



*Image 7: Pulaski (circled) saw rioters move furniture in an attempt to break down the door to ST-6M*

Within a few minutes, rioters had broken the door to ST-6M. *See* Image 8. Rioters then began sacking the office, rifling through papers and bags. Pulaski went into the office and took a photo of documents on a desk before leaving the room. *See* Image 9.



*Image 8: Rioters ultimately broke through the door to ST-6M*



*Image 9: Pulaski (circled) took a photo of documents on a desk using his phone*

Pulaski likely left the building shortly after.[6]   Around the time of the video depicted in Images 8 and 9, police had been reinforced and were ordering rioters to leave the Low Rooms, as well as deploying crowd control munitions, such as flashbangs, on the Lower West Terrace.  *See* SOO ¶ 14.  Pulaski remained on Capitol grounds through at least 5:07 p.m.  At some point, Pulaski jumped off a wall and injured himself, requiring hospitalization. SOO ¶ 15. *See* Image 10.



*Image 10: Pulaski (circled) is carried away from the Capitol after injuring himself*

*Defendant's Pre-Arrest Interview*

On January 12, 2021, FBI agents interviewed Pulaski at the Washington Hospital Center, where he was recovering from surgery as a result of a spinal injury he received on January 6 when he jumped off a wall.  Pulaski said that he traveled from Grand Rapids to DC by himself, and that he wanted to attend former President Trump's "Stop the Steal" rally to livestream the events as a historical moment.  Pulaski claimed that he had previously attended other protests over the course of 2020 to livestream or get video of Antifa members.

---

[6] The Government does not know the exact time that Pulaski left the Building.

Pulaski said he arrived in downtown DC around 7 a.m., but because his phone battery was dying, he returned to his hotel and fell asleep.  Pulaski said he woke up late and rushed to Capitol grounds between 3 p.m. and 4 p.m. and started filming.  Pulaski admitted he saw several people attacking law enforcement officers and others trying to break the windows of the Capitol buildings.[7]  Pulaski recalled wondering whether the individuals attacking cops were Antifa, but concluded that some were definitely Trump supporters.

Pulaski admitted entering the Capitol twice, and going back and forth between the "side" and "front" of the Capitol.  Pulaski said that he entered the Building to get better footage of the events.  Pulaski described that during one of the times he entered the Building, he saw very nice looking Apple computers and decided to leave.[8]  Pulaski also said that, during the second time he entered the Building, he heard tear gas and saw some civilians telling them to get back into the building to escape it.  This is at odds with his earlier explanation that he went into the Capitol to get better footage, and it is also not supported by the evidence.

When he exited the Capitol, Pulaski said that he saw a lot of tear gas.  When more tear gas went off, Pulaski said that he became afraid of being trampled by the crowd, so he decided to try and jump off one of the Capitol walls to the ground level.  He fell a significant distance and suffered severe injuries as a result of the fall.  Some other people in the crowd helped him to an ambulance.

---

[7] However, defense counsel later informed the FBI via attorney proffer that Pulaski "did not for the most part recall witnessing any specific violence through his own eyes of any Assault on law enforcement officers," but when he exited "the capitol for the final time he did see violence on law enforcement officers but he was at a very far distance and pepper gas/some type of gas had begun to be deployed."  Given the time that Pulaski entered ST-2M and its proximity to the Tunnel, it is improbable that Pulaski did not see violence against police.

[8] Defense counsel later clarified via attorney proffer to the FBI that this was the second time he entered the Building.

Although he took numerous pictures and videos on his phone, Pulaski said that he deleted them at the suggestion of his mother who believed he might be arrested. Pulaski said that he regretted his decisions and hoped that no one else got hurt.

*Defendant's Arrest and Post-Arrest Interview*

On December 21, 2023, Pulaski surrendered to agents of the FBI on an arrest warrant in this case. Pulaski declined to answer whether he took photos inside the offices (as depicted in Image 9 above) during his first or second time in the building.

*Defendant's Public Statement*

On December 22, 2023, Pulaski gave a statement about his arrest to a local media outlet. *See* Michael Oszust, "W MI man facing Jan. 6 charges 'appalled' by what he saw," Wood TV (Dec. 22, 2023), available at https://www.woodtv.com/news/kent-county/west-michigan-man-arrested-on-jan-6-charges/. Pulaski told the reporter that that he was not proud of what he had done. Pulaski further said, "There was a lot of violence that day that I don't agree with at all. I didn't partake in any violence. I was very appalled by a lot of the behavior I saw that day. I did make a lot of decisions that day that I do regret."

*The Charges and Plea Agreement*

On February 28, 2024, the United States charged Pulaski by a two-count Information with violating 40 U.S.C. § 5104(e)(2)(D) and (G). On March 6, 2024, pursuant to a plea agreement, Pulaski pleaded guilty to both counts of the Information. He also agreed to pay $500 in restitution to the Architect of the Capitol.

## III.   Statutory Penalties

Pulaski now faces a sentencing for violating 40 U.S.C. § 5104(e)(2)(D) and (G). As noted by the plea agreement and the U.S. Probation Office, Pulaski faces up to six months of

imprisonment and a fine of up to $5,000 on each count.  He must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

## IV.     Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. As described below, the Section 3553(a) factors weigh in favor of a sentence of 21 days' incarceration, 36 months' probation, 60 hours community service, and $500 in restitution.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 579 F. Supp. 3d 1, 8 (D.D.C. Dec. 28, 2021).  While assessing Pulaski's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors.  Notably, for a misdemeanor defendant like Pulaski, the absence of violent or destructive acts is not a mitigating factor.  Had Pulaski engaged in such conduct, he would have faced additional criminal charges.

One of the most important factors in Pulaski's case is that he entered two sensitive spaces of the Capitol Building—ST-2M and ST-6M—non-public conference rooms used by staffers. Pulaski first crawled through the bottom half of a smashed window into ST-2M, feet from the Lower West Terrace Tunnel where rioters were besieging officers.  According to Pulaski, this was

his second entry into the Building that day.  He then tried to pull a rioter wearing a gas mask inside, but when that failed, returned the rioter's stick—an obvious weapon—to him.  Pulaski next watched rioters as they attempted to break down a door into ST-6M and then sacked the office inside.  He too went into that office and took a photo of the papers on a desk.  Pulaski knew long before the police cleared the Lower West Terrace with tear gas—prompting him to ultimately jump from a wall—that he shouldn't have been inside the Capitol Building during a riot.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B.  Pulaski's History and Characteristics

Pulaski's two convictions are both relatively minor and from more than 8 years ago, though Pulaski was sentenced to an alternative jail sentence on conviction for his operating while impaired.  PSR ¶ 29.  To his credit, Pulaski appears to be holding steady employment and has been compliant with pretrial release.  PSR ¶¶ 7, 45.  Pulaski appears to have made a full recovery from the spinal injury that he suffered at the Capitol.  PSR ¶ 40.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot.  *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.").

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The sentence must also provide specific deterrence to Pulaski, which in this case weighs in favor of a term of incarceration.

First, Pulaski has not been completely forthcoming about his conduct on January 6.  Pulaski has been consistently remorseful about his own participation in the riot, and has been largely candid in his interviews with the FBI.  He has also accepted responsibility for his actions by quickly taking a plea in this case.  But he still has not told the whole story about all of his conduct or his motivations for being at the Capitol.  Most notably, Pulaski declined to explain when and where

he entered the Capitol Building the first time.  In addition, Pulaski told the FBI that he went to the Capitol to record and livestream.  But that is not consistent with his conduct.  Pulaski climbed through a broken window into an office inside the Capitol and tried to help other rioters inside, even returning a rioter's weapon when they couldn't get in.  Pulaski's clothes also made his purpose plain—he not only wore a Trump hat, but when inside he picked up a Trump flag and wore it as a cape.  Simply put, Pulaski did not behave as a concerned citizen-journalist, suggesting he has been less than entirely truthful about his motivations.

Second, Pulaski destroyed valuable evidence—specifically, the pictures and videos that he took—fearing he might be arrested.  Because the FBI interviewed him so quickly after the riot, Pulaski must have deleted this evidence *while* he was in hospital recovering from his injuries.  Although Pulaski has since attempted to recover that information, his initial destruction of evidence is a sign that he feared legal repercussions for his actions, not that he wished to do the right thing.

Viewed in its totality, Pulaski's genuine but still incomplete remorse shows that a period of incarceration is necessary to specifically deter Pulaski from participating in a violent riot like January 6.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers.[9]  This Court must sentence Pulaski based on his own

---

[9] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Pulaski has pleaded guilty to Counts One and Two of the Information, charging him with Disorderly and Disruptive Conduct in a Capitol Building or Grounds in violation of 40 U.S.C. § 5104(e)(2)(D) and Parading, Demonstrating or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G), respectively.  This offense are Class B misdemeanors. 18 U.S.C. § 3559.  Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. § 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply, however.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases involving rioters in ST-2M, a sensitive space, provide suitable comparisons to the relevant sentencing considerations in this case.

Mariposa Castro went to the Capitol after she saw rioting on television, where she filmed rioters' assault on the Lower West Terrace for almost 30 minutes.  *United States v. Mariposa Castro a/k/a Imelda Acosta*, 21-cr-299-RBW (D.D.C.).  Like Pulsaki, Castro entered ST-2M through a broken window.  She bragged about her participation through a live Facebook stream, stating among other things that the "[w]ar just started" and "the best is yet to come," and showed a lack of remorse for her conduct afterwards.  Judge Walton sentenced Castro to 45 days' incarceration and a $5,00 fine on her plea to 40 U.S.C. § 5104(e)(2)(G).  Pulaski did not brag or

stream his participation, did not make similarly concerning statements, and appears to be remorseful. That said, he did assist rioters in attempting to enter ST-2M and also went into ST-6M. A sentence of 21 days' incarceration is appropriate for Pulaski.

Richard Avirett entered both ST-2M and ST-4M, another office nearby, where he rifled through papers he found inside the office and messaged photos he took inside on social media. *United States v. Richard Avirett*, 23-cr-191-JEB (D.D.C). Unlike Pulaski, Avirett also made statements both before and after January 6 supporting violence and justifying the riot. He lied to the FBI about his entry into the Capitol and did not show remorse. Chief Judge Boasberg sentenced Avirett to 30 days' incarceration on his plea to 40 U.S.C. § 5104(e)(2)(G). Pulaski's similar conduct, but greater remorse and lack of the similarly concerning statements, justify a slightly lesser sentence.

Adam Honeycutt, a bail bondsman, climbed inside ST-2M and filmed and posted videos of property destruction within.[10]   *United States v. Adam Honeycutt,* 22-cr-50-CJN (D.D.C).. Unlike Pulaski, Honeycutt posted images to social media of confrontations between rioters and police and property destruction committed by other rioters, mocked police, and helped to pass a long wooden plank to other rioters in the Tunnel who were violently battling police. Like Pulaski, Honeycutt deleted images of his participation and minimized his involvement in the riot in a Facebook post. Judge Nichols sentenced Honeycutt to 90 days incarceration on his plea to Section 5104(e)(2)(G), run consecutive to an 18-month sentence on firearms and drug offenses resulting from a search warrant executed in his January 6 case. Again, Honeycutt has substantial

---

[10] This Court previously sentenced Bryan Betancur, 21-cr-51 (TJK), who also entered ST-2M, to four months' incarceration and 12 months supervised release. Betancur had aggravating favors not present here, since Betancur was already on probation on January 6, assisted rioters removing furniture from ST-2M, lied to the FBI, violated his pre-trial release conditions, and was utterly uncooperative with Probation. Betancur also had significant criminal history.

aggravators Pulaski does not, but Pulaski's conduct is not entirely dissimilar—he took photos inside ST-6M and assisted rioters in moving a weapon (stick) outside of ST-2M.  A sentence of 21 days incarceration is appropriate.

The Government acknowledges co-defendants Michelle Estey and Melanie Belger, who also made it into ST-2M, received probation. *United States v. Estey and Belger*, 23-cr-198 (AJR) (D.D.C.)  Notably, Belger also tweeted about violence towards then Vice President Mike Pence and stole a chair leg from ST-2M that rioters had broken; both gave misleading statements in their post-plea interviews. On their conviction of 40 U.S.C. § 5104(e)(2)(G), Judge Reyes sentenced Estey and Belger to 36 months' probation with 250 hours of community service and a fine (as well as restitution).  While these cases have clear parallels, Pulaski entered *two* sensitive spaces, not just one—including watching rioters attempt to break down the door to ST-6M, sack the office, and joining them inside.  And while not extensive, Pulaski has a criminal history that demonstrates, together with his participation in the January 6 riot, a concerning lack of respect for and compliance with the law.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012).  The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an

19

appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

### V.     Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[11] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Pulaski must pay $500 in restitution, which reflects in part the role Pulaski played in the riot on January 6.[12] Plea Agreement at ¶ 11.  As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in

---

[11] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C.  § 3663A(c)(1).

[12] Unlike under the Sentencing Guidelines for which the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023." *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.)  Pulaski's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 74.

## VI.    Fine

The defendant's convictions for violations of 40 U.S.C. § 5104(e)(2)(D) and (G) subject him to a statutory maximum fine of $5,000 on each count. *See* 18 U.S.C. § 3571(b).  In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1). Here, the defendant's financial assets set forth in the PSR suggest that the defendant is unable, and is unlikely to become able, to pay a fine.

## VII.     Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant Curtis Pulaski to 21 days' incarceration on Count One, 36 months' probation on Count Two, 60 hours of community service, and $500 in restitution.  Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on Pulaski's liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:     */s/ Michael L. Barclay*
MICHAEL L. BARCLAY
Assistant United States Attorney
N.Y. Bar Reg. No. 5441423
U.S. Attorney's Office for the District of Columbia
601 D Street, NW
Washington, D.C. 20001
(202) 252-7669
Michael.Barclay@usdoj.gov